[Civ. No. 17052. First Dist., Div. Two. Feb. 26, 1957.]

LEROY JOSEPH BELL, Appellant, v. D. D. WATSON, as Real Estate Commissioner, etc., Respondent.

*Assigned by Chairman of Judicial Council.

Neil Cunningham for Appellant.

Edmund G. Brown, Attorney General, and Carl W. Wynkoop, Deputy Attorney General, for Respondent.

KAUFMAN, J.—This is an appeal from a judgment of the Superior Court in and for the City and County of San Francisco, denying appellant's petition for a writ of mandate seeking to set aside a decision of the Real Estate Commissioner of the State of California revoking appellant's real estate and opportunity broker's license. Appellant Leroy J. Bell contends that the drastic penalty of revocation of license was too severe a penalty in view of the evidence produced against him, and that certain of the charges are not sustained by the weight of the evidence. Three of the charges he admits were committed.

The amended and substituted accusation was in three counts. Count 1 charged violation of section 10176, subdivisions (a), (b) and (i), and section 10177, subdivision (f), of the Business and Professions Code, in that false and fraudulent representations were made by appellant to a Mr. and Mrs. Virgil Morse upon which they relied in purchasing property through appellant.

Count 2 charged violation of section 10176, subdivision (a), (b) and (i), and section 10177, subdivision (f), of the Business and Professions Code, in that appellant made false representations to Mr. and Mrs. Carl F. Landon and Mr. and Mrs. William C. Williams upon which they relied in purchasing real property through appellant. It charged him

with failing to procure a title insurance policy for which he received $107 from Williams and Landon, and with failing to refund the money. He was further charged with having the agreement for the sale of the property to the above parties acknowledged by the notary public, Robert L. Bell, son of appellant who was not present at the time the agreement was executed.

Count 3 charged violation of section 10176, subdivisions (e) and (i), and section 10177, subdivision (f), of the Business and Professions Code, and sections 2830, 2831 and 2832 of the Rules and Regulations of the Real Estate Commission as set forth in title 10, the California Administrative Code. It was alleged that appellant received $500 from Mr. and Mrs. Richard Fontes on or about April 15, 1954, as a deposit on the purchase price of real property which he did not place in a trust fund or escrow account but commingled it with his own money, converting it to his own use, and not accounting for it to the Fontes until about May 25, 1954. Other charges contained in this count were that he received $2,870 as a deposit and part payment for the purchase of real property from Mr. and Mrs. Arthur Pitka and did not place it in a trust or escrow account but commingled it and converted it to his own use; that he received $30 from Joseph Raposa as a deposit and down payment on the purchase of real property which he failed to place in a trust or escrow account but commingled said sum with his own money and converted it to his own use, and that the check which he issued to Raposa in payment of said sum was dishonored by the bank upon which it was drawn.

As to the first cause of action, the hearing officer found that appellant had made false promises to the Morses which he knew to be untrue, that they relied upon said promises; that in arranging for loans appellant failed to disclose to the Morses and concealed from them the fact that a $500 bonus was being charged to them, and that if they had known such facts they would not have signed the note.

As to the Landon and Williams transaction, it was found that the representations made by appellant were not false but were made for the purpose of influencing and inducing the parties to purchase the property. It was found that appellant was paid $107 by these parties on January 17, 1953, to procure a policy of title insurance which he failed to do, but that he returned the sum to them on or about August 1954. It was also found to be true that appellant had caused the agree-

ment of purchase by the Williams and Landons to have been acknowledged without the notary public being present at the time of the execution of the agreement.

In regard to the third cause of action the hearing officer found that on April 15, 1954, appellant received $500 from Mr. and Mrs. Fontes as a deposit and part payment on the purchase of real property at 8740 Almond Lane, Castro Valley, which sum was placed in appellant's real estate trust account, but was withdrawn on April 21, 1954, when the bank closed the account, and the sum was not immediately placed by appellant in a trust or escrow account or in the hands of the sellers of the property, but was commingled with his own money and converted to his own use, and not accounted for to the Fontes until May 25, 1954. It was found in regard to the Pitka transaction that $2,500 of the $2,870 sum deposited with appellant was not placed in a trust or escrow account, but was commingled with his own money and converted to his own use prior to the completion of the transaction and the earning of his commission in the sum of $2,500.

It was further found that appellant while acting as a licensed real estate broker had been collecting $30 per month for Joseph Raposa, and on April 15, 1954, issued a check on his trustee account to Raposa, which check was returned unpaid, marked "account closed," and that subsequently appellant made good to Raposa the check in the sum of $30.

As to the Knopf transaction, it was found not true as to Paragraph VI of the accusation and as to Paragraph VII, that an error had been made in the closing statement furnished to the Knopfs which appellant had subsequently rectified.

It was found that appellant had obtained a $500 deposit for the purchase of real property in the Kaimar transaction and had failed to place the same in a trustee or escrow account but commingled it with his own money and converted it to his own use, and that he later repaid the sum to Kaimar.

Pursuant to such findings, the Hearing Officer determined that respondent had violated section 10176, subdivisions (a), (b), (e) and (i), of the Business and Professions Code, each of which is grounds for disciplinary action; that he had violated provisions of sections 2830, 2831 and 2832, Rules and Regulations of the Real Estate Commission as contained in title 10, California Administrative Code, constituting grounds for disciplinary action under section 10176, subdivision (e), of the Business and Professions Code; that he has acted in a manner that would have warranted the denial

of a real estate license, which constitutes grounds for disciplinary action under provisions of section 10177, subdivision (f) of the Business and Professions Code. It was recommended that appellant's license as a real estate broker be revoked, and this decision was adopted by the Real Estate Commission effective November 1, 1954.

Appellant maintains that the evidence does not sustain the findings on the first two charges concerned with the Morse transaction. The Morses contacted appellant's office, as they wished to buy a home. They had only $750 to offer as a down payment and wished to finance the purchase with a G.I. loan. They dealt first with appellant's agent Sharts to whom they gave the $750 deposit. They did not secure the home they were first interested in as G.I. financing could not be arranged. Thereafter they contacted appellant and advised him that they wished to secure a home on a G.I. loan, and discussed their financial circumstances with him. Six to eight weeks later, after Morse had demanded a refund of the deposit, appellant informed them that he had a house for them. On March 4, 1952, they signed a deposit receipt for the purchase of this property for $9,250, in which it was stated "This offer subject to suitable financing." When they were ready to close the deal in appellant's office, he informed them that G. I. financing could not be obtained on that property but that other financing could be arranged. Appellant informed the Morses that they would be required to assume the first deed of trust G. I. loan, and a second deed of trust in the amount of $2,650 which was to be paid off at $30 per month and the balance at the end of six months. The Morses objected to this plan as they could not pay off the second loan in the period of six months. But appellant told him "Go ahead and make these payments, and by that time you will have enough equity in your house and I can G I it and everything will be paid off." When Morse was asked if the possibility hadn't occurred to him that he might not be able to get a G.I. loan at this later date, he answered, "No sir. Mr. Bell said he would." Again Bell said, "You can't get a G I right now but you will have enough equity in six months' time." Mrs. Morse testified that her husband told appellant that he didn't have the kind of money it would take to pay off the second loan in February of 1953, and appellant said not to worry about it "because after we had been in there for six months we would have enough equity in the house that he would G I it for us. So we signed the papers." Appellant

690

denied that he had made any positive statements about getting the Morses a G.I. loan for the second deed of trust at the end of six months. He testified that he had told them only that he would try, and that he had so tried. He said that the loan company had advised him that probably in six months there might be more money available for G.I. loans, that at that time nobody wanted G.I. money. When asked if he thought that it might be possible to get a G.I. for the purchase price, he answered, "I didn't know. I didn't promise. I didn't sell him the house on that basis." Six months after the Morses purchased the house appellant told them that he couldn't get a G.I. loan for them. The Morses then listed the house for sale with appellant in order that they could pay off the sellers. Neither Mr. nor Mrs. Morse had ever bought a house previous to this transaction with appellant. There was also testimony by the Morses that appellant said he would try to get G.I. financing for them which would seem to conflict with the testimony given by them that he positively promised it by February 1, 1953. From the evidence reviewed above however, it is clear that there is sufficient evidence to support the finding that a promise was made to secure a G.I. loan for the Morses by February 1, 1953. Obviously, the promise was not kept. The hearing officer found that said promise was false and that respondent knew it was false. There is nothing in the testimony of the Morses that gives rise to an inference that appellant knew that the promise was false when he made it. The testimony of Mr. Stone, who was at the time of this transaction with the Russell Investment Company which made the loan, was to the effect that he had advised the Morses when they were brought in to him by appellant that the money market might ease in a few months and a G.I. loan might be obtained for them at that time. According to appellant, Stone was his adviser in regard to loans on this property. This advice could at best induce a belief that there might be a chance to obtain such financing. Appellant also testified that he knew that the Veterans' Administration financing does not permit second financing on an original seller, that the only way that such financing could have been arranged on this property at some future date would have been to have the entire amount paid off. It can be said that appellant's testimony shows, assuming that he made the positive promise, that he made it knowing that it was entirely problematical whether he could produce such financing, and the positive promise was in that sense false.

The testimony of Mr. and Mrs. Morse is sufficient to support the finding that they were not advised of the $500 bonus charged by the Russell Investment Company for the loan of $2,650 on the promissory note not secured by second deed of trust. Appellant was acting for the Morses in this matter as their agent. Mr. Stone of the Russell Investment Company stated that he did not recall the $500 fee being mentioned in the presence of the Morses, that there was no point in mentioning it to them as the investment company usually collected its fees from the real estate broker. He did remember that the fact that there was a brokerage fee had been mentioned in their presence, but not the amount. Appellant testified that he informed the Morses of the amount of the brokerage fee to be charged, that they said that they had made an offer of $250 less on the house than it was listed for, so it was only costing them $250. The witness Anthony also stated that he heard appellant inform the Morses of the $500 brokerage fee. Appellant who had been in real estate business for six years, had never had a transaction before where a lender had charged a fee for a loan. The note signed by the Morses on April 30, 1952, shows only that the principal thereof, is $2,650 with interest at 6½ per cent. The closing statement dated May 23, 1952, furnished to Morse by the Oakland Title Insurance and Guaranty Company shows a total charge of $10,047.58, and one of the items added to the purchase price of $9,250 was listed under the heading "commission" to "L. U. Bell, $500.00."

The evidence reviewed demonstrates that the above finding is supported by substantial evidence, and even though there is impressive contradictory evidence the question of the weight of such evidence has been resolved by the trial court.

In regard to the Landon and Williams transaction, the record supports the finding that it was not shown by a preponderance of the evidence that appellant's statement that the property could be refinanced after three years so that the payments would be brought down to $56 per month, was false, nor that this was a substantial misrepresentation. It was found to be true that the statements were made to induce the parties to purchase the property, and that they entered into the agreement in reliance thereon. This finding cannot be said to be in any way adverse to appellant.

The finding that the Landons and Williams paid $107 on or about January 17, 1953, to appellant for which he promised to secure a policy of title insurance, which sum he

refunded to them in August of 1954 is supported. The finding does not state that he did not secure the policy, but it is admitted in the record that he did not. His counsel said that there would be some technical things that they were going to admit ''and this is one of them.'' Appellant explained that his son collected the money, it went into the account, and he thought that the policy had been issued until it was called to his attention.

The finding that appellant caused a certain agreement for the purchase of real property to be acknowledged by Robert L. Bell, a notary public, and that Robert L. Bell was not present when the agreement was executed and signed by the parties is supported by the testimony of the Landons and the Williams that Robert Bell was not present when they signed the agreement. The document dated February 10, 1953 (Ex. 15), shows that it was acknowledged by Robert Bell on February 16, 1953. Appellant argues that no witness testified that appellant had anything to do with notarizing the document. However, the document was in his custody, and when it later appeared containing the acknowledgment, it is a permissible inference that appellant caused the acknowledgment to be placed thereon by his son.

As to the Fontes' transaction it was found that on April 15, 1954, respondent received a deposit while acting in the capacity of a real estate broker as a deposit on property at 8740 Almond Lane, Castro Valley, which sum was placed in appellant's real estate trustee account, that on April 21, 1954, it was withdrawn by appellant when this account was closed by the bank, that he failed to immediately place said sum in a trust fund account, escrow depositary *or in the hands of the sellers of the property* but commingled it with his own money and converted it to his own use not accounting to the Fontes for it until May 25, 1954. The facts that the amount was received, that it was placed in the bank and that the bank closed the account on April 21, 1954, were admitted by stipulation. The only testimony on this matter was given by appellant who stated that after the bank account was closed he held this money in his safe. He stated that the property on Almond Lane was his own home property. He was to sell a store for the Fontes, and the sale of appellant's house was contingent on the sale of the Fontes' store. Appellant was negotiating with an oil company which was considering buying the store property as a site for a filling station. When this deal fell through he repaid the Fontes their

deposit. Since there is no contradiction of the testimony that appellant himself was the seller of the property on which the deposit was made, it appears that the finding that he did not place the sum ''in the hands of the sellers of the property'' is unsupported. No evidence was offered to contradict the testimony that 8740 Almond Lane was appellant's home property. He gave this address at the beginning of his testimony when he was asked where he lived.

Appellant admits that in regard to the Pitka transaction, he was technically in violation of section 2830 of the commissioner's rules when he converted $2,500, the amount of his commission on the deal, to his own use prior to the completion of the transaction and the earning of his commission.

The finding that appellant issued a check on his trustee account in the sum of $30 to Joseph Raposa on whose behalf he was collecting on account, that the check was returned unpaid, marked ''account closed,'' and that appellant subsequently made good the amount to Raposa is adequately supported by stipulation and appellant's own testimony.

The finding on the Knopf transaction as to the charge of commingling was in appellant's favor. The charge that he had caused a false closing statement to be issued in this transaction was found to have been merely an error which he subsequently corrected.

As to the final transaction, it was stipulated that appellant received a $500 deposit on certain real estate known as the Clark property, which sum appellant did not place in a trust fund, neutral escrow depositary or in the hands of the seller of the property. Appellant's son Robert testified that the deposit was placed in the general account rather than the trustee account through error. He said that he was not acting under his father's direction in doing this, and that it had been his intention to deposit it in the trustee account.

Appellant cites *Manning* v. *Watson,* 108 Cal.App.2d 705, 712 [239 P.2d 688], as authority that the evidence most favorable to appellant must prevail on appeal. This contention apparently results from a misinterpretation of the language in that case. In the cited case the trial court had reversed the decision of the commission on the ground that the evidence did not support the findings of the hearing officer. The Real Estate Commissioner is the appellant in that case. The court stated that the only question before it was whether ''the evidence, viewed in the light most favorable to the respondent

sustains the finding of the trial court to the effect that the charges against respondent were not supported by the weight of the evidence." Although the accused is addressed as "respondent" in the proceedings before the hearing officer, the word was not used in that sense in the above opinion, but was used in reference to the party prevailing in the trial court.

The findings reviewed above which are supported by substantial evidence form a basis for the determination by the hearing officer that appellant has violated provisions of section 10176, subdivision (a), (b), (e) and (i), of the Business and Professions Code. That section provides that a real estate license may be temporarily suspended or permanently revoked if the licensee has been guilty of any of the following: "(a) Making any substantial misrepresentations. (b) Making any false promises of a character likely to influence, persuade or induce. (e) Commingling the money or other property of his principal with his own. (i) Any other conduct, whether of the same or a different character than specified in this section, which constitutes fraud or dishonest dealing." It was determined also that appellant had acted in a manner that would have warranted the denial of an application for a real estate license, an additional ground for suspension or revocation provided for in section 10177, subdivision (f), Business and Professions Code. It was also properly determined that appellant had violated sections 2830 and 2832 of title 10 of the California Administrative Code in that in certain instances he did not place funds entrusted to him by his principal, in trust fund accounts in cases where such funds were not immediately placed in escrow or in the hands of principals; that he failed to maintain a trust fund account when required and to deposit trust funds received in said account, which may be construed as commingling in violation of sections 10176, subdivision (e), 10301, subdivision (e), and 10561, subdivision (e), of the Real Estate Law. ▮ Although there was considerable evidence as to the manner in which the records were kept by appellant and his son, no finding was made in regard to the keeping of records. Therefore there is no finding to support a determination that section 2831 of title 10 was violated. That section is concerned with the manner in which records must be kept, subject to inspection by the commissioner or his deputies.

In view of the fact that there is no finding to support the determination that section 2831 of title 10 was violated, and

that the finding in regard to the Fontes transaction is not supported by the evidence, the decision of the trial court must be reversed and the case remanded to the Real Estate Commissioner for a redetermination of the penalty to be assessed against appellant. (*Bonham* v. *McConnell*, 45 Cal.2d 304, 306 [288 P.2d 502] ; *Copper* v. *State Board of Medical Examiners*, 35 Cal.2d 242 [217 P.2d 630, 18 A.L.R.2d 593].)

Judgment reversed as to penalty and cause remanded to the Real Estate Commissioner for a redetermination of penalty to be assessed against appellant.

Dooling, Acting P. J., and Draper, J. pro tem.,* concurred.

*Assigned by Chairman of Judicial Council.